IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM MANUS, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| BP CORPORATION NORTH AMERICA, INC., et al., | : | NO. 12-2521 |
| Defendants. | : | |

**MEMORANDUM**

L. Felipe Restrepo, U.S. District Court Judge                        September 18, 2013

William Manus ("Plaintiff") filed this action under the Employee Retirement Income Security Act ("ERISA"), alleging that Defendant BP Corporation North America, Inc. and Defendant BP Retirement Accumulation Plan[1] ("Defendants") are failing to pay him all the amounts owed from his employee retirement plan. Presently before the Court is Defendants' Motion for Summary Judgment. Because this matter is barred by the statute of limitations, the motion will be granted.

**I.  STANDARD OF REVIEW**

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby,*

---

[1] On June 26, 2012, three other Defendants in this case, BP North America, Inc., BP Benefits Center and Fidelity Investments Institutional Operations, Co. were dismissed by way of Plaintiff's Amended Complaint. Doc. No. 3.

*Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id*. at 248.

When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-moving party. *Id.* at 255; *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citations omitted); *see also Crawford v. Beard*, 2005 U.S. Dist. LEXIS 887, at *5 (E.D. Pa. Jan. 19, 2005) (*citing Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992)). Thus, summary judgment is appropriate if, after reviewing the evidence and making all inferences in favor of the non-moving party, there is no genuine issue of material fact to warrant a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## II. FACTS AND PROCEDURAL HISTORY

William Manus ("Plaintiff") is a former employee of Atlantic Richfield Company ("ARCO"). Defs.' St. Facts ("SOF"), Doc. No. 18 at ¶ 1. On or about June 28, 1950, Plaintiff began his employment at ARCO. SOF ¶ 2. While employed there, Plaintiff participated in a retirement plan sponsored by ARCO (the "ARCO plan"), into which he made required and voluntary contributions. SOF ¶¶ 3-5; BP-MANUS 9-11. On September 16, 1969, Plaintiff's employment with ARCO ended. SOF ¶ 6. In a letter dated September 20, 1969, Plaintiff indicated that he wanted to keep his contributions as part of the Arco Plan. SOF ¶ 7.

On or around March 27, 1986, Plaintiff received a document captioned "Estimate of Retirement Allowance and Social Security Benefits" (the "1986 Estimate") SOF ¶ 8; BP-MANUS 39-40. According to this document, Plaintiff's monthly benefit under the ARCO Plan would be $512.69 if he elected to receive the benefit for his lifetime, with 50% of the benefit payable to his beneficiary upon his death. *Id*. Plaintiff also received an estimate for a lump sum

distribution. BP-MANUS 140. On April 23, 1990, Plaintiff received another estimate, for a proposed retirement date of October 1, 1990. BP-MANUS 150-151. This estimate also provided Plaintiff with an estimate for a lump sum distribution. *Id.*

On May 29, 1990, Plaintiff was informed that he would begin receiving benefits on or around October 1, 1990. BP-MANUS 149. Plaintiff completed required pension election paperwork, which had checkboxes that ostensibly show whether Plaintiff was electing to take a lump sum payment. BP-MANUS 171, 73, 75. The boxes for the lump sum payment were not selected. *Id.* Payments to Plaintiff under the Plan began in October, 1990, at a rate of $397.46 per month, not $512.69. SOF ¶ 14. Plaintiff has been receiving $397.46 ever since. *Id.*

On or about April 18, 2000, a corporation related to BP acquired ARCO and its affiliates. SOF ¶ 15. In connection with that acquisition, BP became the sponsor and administrator of the ARCO plan. *Id.* On December 21, 2001, BP sent Plaintiff a letter ("the 2001 Letter") that informed him that the administrative responsibilities for his payments were to be transferred to Fidelity Investment Group. BP-MANUS 29. The 2001 Letter also noted that Plaintiff's monthly benefit amount was $397.46, but did not give any detail of how that amount—which Plaintiff had received at that point for eleven years—was calculated. *Id.* Effective January 1, 2002, the ARCO plan merged with and into the Plan. BP-MANUS 206.

Sometime in 2008, Plaintiff moved into a new home. Doc. No. 3 at ¶ 25. During the course of this move, Plaintiff rediscovered the 1986 Estimate, which was in his files. BP-MANUS 11, 37, 82-83. Because the 1986 Estimate indicated that he would receive $512.69, rather than the $397.46 he was actually receiving, Plaintiff contacted Defendants to inquire about the amount of benefits he was receiving. BP-MANUS 1-2.

On November 25, 2008, BP Retirement Services informed Plaintiff that its records

showed that the required employee contributions piece of his pension had been withdrawn as a lump sum at the time his benefits commenced, thus his benefit amounts were smaller than what the 1986 Estimate indicated. *Id.* at 1. Plaintiff requested reconsideration, stating that he never withdrew any money. *Id.* at 2. In response, on December 9, 2008, BP Retirement Services informed him that it believed that he was receiving the correct amount. *Id.* at 3-4. Plaintiff then filed a formal claim with the Plan Administrator, which was received by BP on January 13, 2009. *Id.* at 7-8.

On January 16, 2009, Plaintiff responded to an information request from Defendants. SOF ¶ 31. Plaintiff affirmed that he began receiving payments in 1990. *Id.* When asked why he did not raise the issue of an apparent underpayment sooner, he stated that he only recently had located the 1986 Estimate. BP-MANUS 9. On May 12, 2009, the Plan's Claims Administrator denied Plaintiff's claim, pointing to Plaintiff's failure to raise the issue of the alleged underpayment—approximately a 20 percent difference—in a timely fashion. BP-MANUS 17-20.

On May 30, 2009, Plaintiff appealed this determination. BP-MANUS 36-38. On October 15, 2009, the Appeals Administrator affirmed the decision to deny Plaintiff's claim. BP-MANUS 46-50. Among other things, the Appeals Administrator stated that the discrepancy between Plaintiff's actual benefit and his claimed benefit was sufficiently large that an alleged discrepancy would have been readily apparent to Plaintiff upon receipt of his pension payments in 1990.[2] BP-MANUS 49.

On November 21, 2009, Plaintiff wrote to BP to dispute the Appeal Administrator's

---

[2] Additionally, while not dispositive for this motion, other Plan records reflected that, unlike the election forms that did not appear to select any lump sum payments, BP-MANUS 171-75, the required contributions were withdrawn at the time of commencement of his benefits, BP- MANUS 74-80.

4

decision. BP-MANUS 81-88. On October 15, 2009, BP informed Plaintiff that the Appeals Administrator's decision was final. *Id.* at 50. On January 19, 2011, after staff for Defendants visited Plaintiff at his home to review his records, the Appeals Administrator informed Plaintiff that it would not be changing the prior decision on Plaintiff's claim for benefits. BP-MANUS 107-110. Defendants informed Plaintiff that he could appeal the decision in court, noting that he had two years to appeal from that date. *Id.*

Plaintiff filed the instant lawsuit on May 8, 2012. On January 18, 2013, Defendants filed their motion for summary judgment, to which Plaintiff responded on February 8, 2013. On July 8, 2013, this matter was transferred to this Court from the Honorable Gene E.K. Pratter. On August 22, 2013, this Court heard argument on the motion.

### III. LEGAL ANALYSIS

#### a. Plaintiff's Claim Is Barred by the Clear Repudiation Rule

ERISA does not have a statute of limitations for non-fiduciary claims for additional benefits within the text of the law itself. As such, and as the parties acknowledge, the statute of limitations in a Pennsylvania-based claim for additional benefits is four years, as defined by state contract law. *See Keen v. Lockheed Martin Corp.*, 486 F. Supp. 2d 481, 486 (E.D. Pa. 2007). As the parties also acknowledge, when, as here, there is no controlling statute, the federal "discovery rule" governs when this statute of limitations begins to run. *Swartz v. Teachers Ins. and Annuity Ass'n—Coll. Ret. Equities Fund,* No. 11-1142, 2012 WL 1138603, at *5-6 (E.D. Pa. Mar. 30, 2012) (citing *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 520 (3d Cir. 2007).

Within the ERISA context, the Third Circuit has further refined the discovery rule "into a 'clear repudiation' rule whereby a non-fiduciary cause of action accrues when a claim for benefits has been denied." *Swartz,* 2012 WL 1138603 at *6 (citing *Romero v. Allstate*

5

*Corporation,* 404 F.3d 212, 220 (3d Cir. 2005). Under the clear repudiation rule, a formal denial of a benefit is not required "if there already has been a repudiation of the benefits which was (1) clear and (2) made known to the beneficiary. Put simply, the statute of limitations may be triggered by some event other than a denial of a claim where that event clearly alerts the plaintiff that his entitlement to benefits has been repudiated." *Fletcher v. Comcast Comprehensive Health and Welfare Plan*, No. 09-1272, 2011 WL 743459, at *4 (W.D. Pa. Feb. 24, 2011) (internal quotations and citations omitted).

The Third Circuit has further held that even an underpayment of benefits may serve as repudiation, and that "repudiation by underpayment should ordinarily be made known to the beneficiary when he first receives his miscalculated benefit award." *Miller*, 475 F.3d at 521-22. This is because "[a beneficiary's] receipt of diminished payment gives immediate, obvious notice to [him] that something is amiss." *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1180-81 (3d Cir. 1992). Further, the Third Circuit puts at least some limited duties on a beneficiary in such a situation, stating that he "should exercise reasonable diligence to ensure the accuracy of his award." *Miller*, 475 F.3d at 522.

In other underpayment cases in this Circuit, courts have repeatedly found that evidence beyond the receipt of a check itself demonstrates that a party should have known that something was amiss with his benefits, such that the statute of limitations was triggered. For example, in *Miller*, the Third Circuit was persuaded that the plaintiff should have discovered his injury earlier, not just because he received a benefit that was too small, but because this benefit was based on a calculation simple enough that underpayment would have been readily discoverable or apparent to him. 475 F.3d at 522 ("This repudiation should have been clear to him upon initial receipt of payment in 1987-monthly checks based on a simple calculation of sixty percent of his

salary should have alerted him that he was being underpaid."); *see also Martin v. Prudential Ins. Co. of America*, No. 12-6208, 2013 WL 3354431, at *6 (D.N.J. July 2, 2013) (underpayment could have been easily derived from the calculations listed on the award letter itself). In other cases, district courts have found clear repudiation when evidence demonstrated that a plaintiff argued for years with his ERISA administrator about a claim, demonstrating his knowledge that something was amiss, *Hill v. Conn. Gen. Life Ins. Co.*, No. 07-1706, 2008 WL 4200161, at *1-2 (W.D. Pa. Sept. 08, 2008); when a plaintiff's counsel sent multiple letters to an ERISA administrator years prior, arguing about his client's benefit level and even appealing a determination, *Bryer v. Met. Life Ins. Co.*, No. 09-1869, 2010 WL 1783776, at *1 (E.D. Pa. 2010); and, when a plaintiff received a letter from an administrator, years prior to the suit, stating that the plaintiff had withdrawn a lump sum of money, *Swartz,* 2012 WL 1138603 at *6.

Here, Defendants put forward two possible triggering events that constitute a clear repudiation. First, Defendants argue that the receipt of benefits alone, which Plaintiff began receiving in 1990, served as a clear repudiation. There is little documentation on the record for what documents accompanied Plaintiff's initial receipt of benefits—perhaps understandable, given that it was 23 years ago—but there is no dispute that Plaintiff has been receiving his benefit the entire time. Second, Defendants argue that repudiation was accomplished by the 2001 Letter, which informed Plaintiff that responsibilities were transferred to Fidelity Investment Group. BP-MANUS 29. That letter again listed Plaintiff's benefit as $397.46, but said little else. *Id.*

Given that Plaintiff acknowledges that he was receiving $397.46, this Court does not find that the 2001 letter, which does nothing more than confirm this same fact, has any bearing on this analysis. Put differently, if the receipt of benefits in 1990 did not serve as a clear repudiation,

than the 2001 letter would not serve as a repudiation either, because it does nothing but confirm Plaintiff's award, in a matter no more "explanatory" than the receipt of a paper check. Instead, this comes down to a simple question: Given the record here, is Plaintiff's initial receipt of benefits itself a clear repudiation, such that the statute of limitations has run?

### i. Plaintiff's Alleged Underpayment in 1990 and his Possession of the 1986 Estimate Was Enough to Trigger the Statute of Limitations

As Plaintiff stated in his Complaint and in his letters to Defendants, the entire reason that his suspicion was raised about a suspected underpayment was that he reviewed a document that was in his possession the entire time: the 1986 estimate. BP-MANUS 11. ("The reason for my current request is that I have recently discovered information in my files (pension estimate and aforementioned letter to W.W. Reeder) that precipitated my review."); BP MANUS 37, 82-83. As Plaintiff repeatedly stated in his letters to Defendants, and as demonstrated by the record, the 1986 Estimate, when coupled with the actual payment of $397.46 was alarming enough for him to promptly take action to determine what his true benefit should be. It seems apparent that if the 1986 Estimate was enough to put Plaintiff on alert in 2008, it was enough to do so in 1990, especially given that Plaintiff still held the estimate in his files.

In fact, Plaintiff's claims for additional benefits, based on documents in his possession for years, is seemingly the precise situation that the Third Circuit developed the clear repudiation rule to avoid. *See Miller*, 475 F.3d at 522 ("[A] plaintiff could receive benefit checks for decades before deciding to investigate the accuracy of his award-a plaintiff could thereby trigger the statute of limitations at his own discretion, creating an indefinite limitations period. We decline to invite such a result."). Plaintiff would not have had to make complex calculations to determine something was amiss. Instead, he would have had to look at the twenty percent difference between the estimate that he possessed and the benefit he received.

Further, at argument and in his motion, Plaintiff actually argued that he was alerted by the 1990 payment that something might be amiss, and that as a result he made inquiries about why his benefit was less than expected. Pl.'s Mem. Opp'n at 2 ("When Plaintiff received his actual retirement monies in 1990, he was told by Defendants' agents that the actuarial numbers had changed and this was the reason for the discrepancy."). In other words, Plaintiff argues that he understood that his payment was less than he should have otherwise received, but that he was misled about the reasons behind the underpayment. This potential misrepresentation is conceivably a valid reason to avoid the triggering of the statute of limitations. However, Plaintiff conceded at argument that no facts on the record—not even an affidavit from Plaintiff himself—actually support that anyone misled him. Additionally, there is not anything on the record—again, not even an affidavit from Plaintiff—that there were problems with the notice that he received in 1990. *See Miller*, 475 F.3d at 523 ("Without any indication of deficient notice, a beneficiary's receipt of an award is sufficient to inform him that the plan has determined his entitlement."). Moreover, there also is a total absence of any facts on the record that demonstrate Plaintiff's "reasonable diligence to ensure the accuracy of his award." *Id.* at 522. Finally, at argument Plaintiff could point to nothing on the record that supports a conclusion that he "safeguard[ed] [his] rights" in any way at all, as the Third Circuit requires. *Id.*

It is possible that if Plaintiff had submitted evidence on his own behalf, such as a sworn declaration that he was misled or had problems with his notice, as he argues in his memorandum, that the outcome of this decision could be different. *See Fletcher*, 2011 WL 743459 at *7 (finding, among other things, that a sworn declaration from an ERISA plaintiff may be used to rebut presumption of adequate notice.) However, the record that is before this Court provides "no basis . . . to infer that the repudiation was unclear to him at that time," *Id.* at 522, particularly

9

when he had in his possession a document that was clearly sufficient to alert him that something was amiss.

## IV. CONCLUSION

The Third Circuit requires that ERISA recipients exercise reasonable diligence in ensuring the accuracy of their awards. *Id.* at 522. While this does not mean a beneficiary must safeguard the accuracy of his benefit at every turn, it does require the exercise of certain, limited responsibilities. Here, Plaintiff submitted no evidence as to his reasonable diligence; submitted no evidence of a deficient notice; submitted no evidence that he was misled at the time of his retirement, despite apparent suspicions; and, who had, in his possession a document that was clearly sufficient to arouse his suspicion that he was receiving twenty percent less in benefits than he thought he was owed. As such, the Court must rule that Plaintiff's receipt of benefits in 1990 served as a clear repudiation of his benefit claim, triggering the four year statute of limitations. Accordingly, the statute of limitations expired in October of 1994, Plaintiff's claim is time-barred and the motion is granted.

An implementing order follows.